UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | |
|---|---|
| GARY SIMPKINS, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 0: 19-098-DCR |
| ) | |
| V. ) | |
| ) | |
| BOYD COUNTY FISCAL COURT, et al., ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendants. ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Plaintiff Gary Simpkins filed this civil rights action alleging that, during his brief stay at the Boyd County Jail, staff battered him and held him for several hours in a restraint chair with a tight strap around his neck. The Court granted the defendants' motion for summary judgment, concluding that Simpkins had not provided sufficient evidence indicating that a government action was the moving force behind his alleged injuries. The United States Court of Appeals for the Sixth Circuit reversed that determination, finding that the Court failed to properly consider a Department of Justice Report that supported Simpkins' claims. The Court will deny the defendants' motion for summary judgment in light of the Sixth Circuit's conclusions.

**I.     Background**

The relevant facts as alleged by the plaintiff are as follows: A police officer stopped Simpkins for speeding in Ashland, Kentucky on September 13, 2018. Simpkins advised the officer that he was speeding because he was having chest pain and was on his way to a hospital. But while running his license, the officer discovered that Simpkins had an outstanding warrant

for terroristic threatening in another county.  The officer placed Simpkins under arrest but took him to a local hospital for evaluation.  Following a series of tests, a physician determined that Simpkins had no acute issues and discharged him.  The officer then transported Simpkins to the Boyd County Detention Center ("BCDC" or "jail"), arriving at approximately 4:00 a.m. on September 13.

Simpkins recalled that "a little short fat guy with a black head" booked him into the jail. [Record No. 15, p. 25]  He stated during his deposition that he "told them all about [his] medical issues" during booking.  Simpkins completed a "Standard Medical Questions" form in which he indicated that he: (i) had cancer; (ii) was taking prescription medicines that may need continuation while he was in jail; and (iii) had previously sustained a closed head injury that resulted in a permanent disability. [Record No. 18-4, p. 4]  Simpkins also reported during his deposition that he suffered from Crohn's disease, hepatitis, kidney stones, acid reflux, and scar tissue on his brain. [Record No. 15, p. 20]  He completed a "Mental Health Questions" form during intake in which Simpkins indicated that he had a serious mental health condition that may need attention while he was in jail, that he had previously attempted suicide, and that he was currently thinking about suicide. [Record No. 18-4, p. 6]

Simpkins was placed in a cell with two other inmates following the booking process. [Record No. 15, p. 26]  Eventually, the two other inmates were moved and Simpkins was alone in the cell for a period of time.  There was a call button in the room, but Simpkins thought it did not work.  However, he pressed it twice because he needed his medicine.  The second time, Deputy James Layne told Simpkins to sit down and shut up.  Simpkins began beating on the door because he was desperate for his medicine.

Layne advised Simpkins that he was being moved to "D-block."[1] *Id.* at 32. There were five other inmates in the D-block cell and they told Simpkins that there was not enough room for him there. One of the other inmates told a deputy that Simpkins had threatened suicide (which he denies). At that point,

> that guy that had a cap on, kind of short red hair … he walked me down beside of a room that had a guard sitting in on a computer and then he put these leather gloves on and he grabbed me by the head and slammed it up against the wall like that and said, "Hold your head right there." And then he just started beating me (sound effects)—like that and I started crying. I said, "Why did you do me that way? You're hitting me right where I'm hurt at."[2]

*Id.* at 33.

Thereafter, Layne escorted Simpkins to a bathroom to change into a paper smock. Simpkins concedes that, at some point, he advised Layne that he needed his medicine before he "start[ed] thinking about suicide." *Id.* at 34. Layne then placed Simpkins in a new cell described as "high watch," where the plaintiff was alone for approximately thirty minutes. *Id.* at 35-36. Simpkins asserts that he was growing dizzy and continued to ask for his medicine. But an employee (Osborne) advised Simpkins that a nurse stated that he could not have his medicine because it was "out of date." *Id.* at 36. Layne came "running through" and told Simpkins to sit down on his mat. *Id.* at 37. After Simpkins sat down, Layne "just [ran] up and grabbed [him] by the arm, twisted it like that, and kicked [him] in the side" and said, "get up." According to Simpkins,

---

[1] Layne's incident report states that Simpkins was moved to D Block at approximately 1:00 p.m. on September 13 "for disrespect". [Record No. 18-4]. Simpkins testified that he did not know what time he was moved. [Record No. 15, p. 28]

[2] Layne's incident report identifies the individual who walked Simpkins from D-Block to booking as "Deputy Payne," but Simpkins did not know the person's name.

> [Layne then] throwed [him] in that chair and he strapped it tight as he could get it.  He jerked it like that.  Pulled it back and went (sound effects) on the Velcro and done my arms the same way and he said—put this cap on me that looked like a bowl that was turned upside down.  And he pushed me in that cell, and slammed it down backwards.  He said, "now, bitch, there's your medicine," and then slammed the door (sound effect).

Simpkins contends that "they strapped [him] right across the neck like that as tight as they could get it" and he "laid there all night choking." *Id.* at 21, 29.  Deputy Kouns said, "Scream, bitch," before Simpkins passed out.

Simpkins' uncle came to bond him out of jail around 11:00 p.m. that night (September 13).  Simpkins recalled still being strapped into the chair when "a little short chubby guy" woke him up to tell him that someone was there to pick him up.  He told Simpkins, "I'm so thankful somebody come and got you because Layne had intention of killing you today."  Simpkins had a "big welt" across his neck when the strap was removed and his ribs were "killing [him]."  After being released, Simpkins retrieved his car from impound and went home to rest before seeking medical attention.

Simpkins filed this action in the Boyd Circuit Court alleging claims under 42 U.S.C. § 1983 against the following defendants: the Boyd County Fiscal Court; Boyd County employees Jimmy Joe Burchett and Unknown Defendants (individually and in their official capacities); and Boyd County employees Carl Tolliver, John Greer, Thomas Jackson, Stephen Towler, and Bill Hensley (in their official capacities).  Burchett was Jailer at the time of the events alleged and Hensley was Jailer at the time the Complaint was filed.  Tolliver, Greer,

and Jackson were Boyd Fiscal Court Commissioners at the time of the events alleged and Towler was Boyd County Judge Executive.[3]

Simpkins alleges violations of his Eighth, Tenth, and Fourteenth Amendment rights based on the excessive force to which he contends he was subjected at BCDC. Simpkins also alleges that the County and its supervisory officials failed to properly train and/or supervise staff at BCDC. He claims that the treatment to which he was subjected "was not unusual, but part of a continuing policy, pattern, custom, and/or practice of the Defendants of willfully and deliberately physically and mentally abusing the inmates."

The defendants timely removed the matter to this Court and, at the conclusion of discovery, moved for summary judgment. Judge Wilhoit granted the defendants' motion for summary judgment on April 9, 2021, concluding that Simpkins had developed no evidence that any policy, procedure, or custom of Boyd County was the moving force behind the excessive force allegedly used against him. Simpkins appealed and the Sixth Circuit reversed this Court's decision, concluding, *inter alia*, that this Court had given short shrift to a Department of Justice ("DOJ") Report upon which Simpkins relied upon in his attempt to establish a custom of excessive force. *Simpkins v. Boyd Cnty. Fiscal* Court, 48 F.4th 440 (6th Cir. 2022). As a result, and following transfer, the undersigned reinstated the defendant's motion for summary judgment and relevant briefing, and reconsiders the motion it in light of the Sixth Circuit's decision. [*See* Record Nos. 13, 18, 19, 26.]

---

[3] Simpkins also asserted a negligence claim which was previously dismissed. He failed to raise that issue on appeal and, therefore, it is not at issue here.

All claims against Burchett were dismissed, without prejudice, on April 9, 2021 under Rule 4(m) of the Federal Rules of Civil Procedure. [Record No. 22]

## II. Standard of Review

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party has satisfied this burden, the burden shifts to the nonmovant. The nonmoving party may not simply rely on its pleadings but must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). In other words, the nonmoving party must present "significant probative evidence that establishes more than some metaphysical doubt as to the material facts." *Golden v. Mirabile Invest. Corp.*, 724 F. App'x 441, 445 (6th Cir. 2018) (cleaned up).

The Court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, a dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. The Court may not weigh the evidence or make credibility determinations but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III. Discussion

It is first necessary to clarify the identity of defendants in this case. Simpkins named as defendants the Boyd County Fiscal Court, its commissioners, the county's judge executive, and the Boyd County Sheriff, all in their official capacities. In Kentucky, fiscal courts are county governments. *See Conn v. Deskins*, 238 F. Supp. 3d 924, 931 (E.D. Ky. 2017) (citing

*Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962, 971 (6th Cir. 2006)). County jails are owned and provided for by the county fiscal court and operated by the jailer. *Webb v. Jessamine Cnty. Fiscal Court*, 802 F. Supp. 2d 870, 887 (E.D. Ky. Aug. 5, 2011) (citing K.R.S. Chapters 71 and 441). Because the claims against the county employees *in their official capacities* represent claims against the Fiscal Court, they may be dismissed as duplicative based on the defendants' motion for summary judgment. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Simpkins*, 48 F.4th at 447. Therefore, the Boyd County Fiscal Court is the only remaining defendant.

### 42 U.S.C. § 1983 – Excessive Force and Failure to Train

A plaintiff must set forth facts that establish the deprivation of a right secured by the Constitution or laws of the United States caused by a person acting under color of state law to state a claim under 42 U.S.C. § 1983. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Although Simpkins' constitutional claims are not framed with precision, it is clear that they are based on his allegations that Deputy Layne and the deputy with "short red hair" used excessive force against him and that they were inadequately trained and/or supervised.[4] Pretrial detainees have the right to be free from the use of excessive force under the Due Process Clause of the Fourteenth Amendment.

There appears to be no dispute that Layne and the other deputy were acting under color of law during the time in question. However, it is well-established that "a local government cannot be sued under 42 U.S.C. § 1983 for an injury inflicted solely by its employees or

---

[4] The Sixth Circuit acknowledged that Simpkins waived the claim that he was unconstitutionally deprived of medication by failing to raise it on appeal. *Simpkins*, 48 F.4th at 446 n.4.

agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993) (observing that the principle of *respondeat superior* is inapplicable to § 1983 actions). Instead, it is only when the "execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983." *Id.* To establish municipal liability, a plaintiff must identify the municipal policy or custom, connect it to the municipality, and show that his particular injury was incurred due to execution of that policy or custom. *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: the existence of an illegal official policy or legislative enactment; that an official with final decision-making authority ratified illegal actions; the existence of a policy of inadequate training or supervision; or the existence of a custom or tolerance or acquiescence of federal rights violations. *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013). Simpkins attempts to prove his claim by way of the latter two options.

"A 'custom' for purposes of *Monell* liability must 'be so permanent and well settled as to constitute a custom or usage with the force of law." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). In addition to the facts alleged in his own case, Simpkins relies on a 12-page DOJ Report issued following its investigation of BCDC pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 ("CRIPA"). [Record No. 18-6] The DOJ notified BCDC of its intent to conduct an investigation pursuant to CRIPA on November 1, 2016. The focus of the investigation was to determine whether the BCDC: adequately protected its prisoners from harm due to excessive force; violated prisoners' rights to bodily privacy; and placed prisoners in restrictive housing

without due process of law. [Record No. 18-6] One or more DOJ officials, along with a correctional security consultant, performed an onsite inspection on November 14 through 17, 2016, during which they observed facility processes, interviewed current and former staff and prisoners, met with county officials, and reviewed facility records. The report was issued on February 28, 2019.

This Court previously determined that the DOJ Report was inadmissible, relying, in part, on the following provision within the Report:

> The Department does not serve as a tribunal authorized to make factual findings and legal conclusions, and nothing in this Notice should be construed as a factual finding or legal conclusion. Accordingly, this Notice is not intended to be admissible evidence and does not create any legal rights or obligations.

But Simpkins argued on appeal that the Report is admissible as a non-hearsay public record under Rule 803(8) of the Federal Rules of Evidence. [*See* Record No. 26, p. 17] The matter was remanded, in part, for further consideration of this argument.

Rule 803(8) provides that a "record or statement of a public office" is admissible as non-hearsay if:

> (A) [I]t sets out:
>     (i) the office's activities;
>     (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>     (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

The Sixth Circuit observed that neither party disputes that the Report satisfies Rule 803(8)(A). [Record No. 26, p. 18] To determine if the report is trustworthy under Rule 803(8)(B), district courts consider four factors: "(1) the timeliness of the investigation upon

which the report is based; (2) the special skill or experience of the investigators; (3) whether the agency held a hearing; and (4) possible motivational problems." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

On appeal, the defendants did not assert a substantial challenge to the trustworthiness of the Report. Instead, they noted only that "[w]ith how quickly personnel, policies, training[,] and operations of a government facility can change over the course of two plus years, [the report has] no inherent trustworthiness." [Record No. 26, p. 19] The Sixth Circuit suggested that the *Alexander* factors likely had been satisfied. With respect to timeliness, investigators analyzed incidents that occurred between 2015 and 2016, but, in 2019, analyzed additional incidents that had occurred in 2017 and 2018. There was nothing to suggest that the DOJ was untimely in reviewing records or that the evidence had gone stale.

The court also observed that the DOJ's Special Litigation Section authored the report pursuant to its "special skill" as a department given statutory investigative authority. Further, there was nothing in the record to suggest that the DOJ suffered from "motivational problems." While the absence of a formal hearing weighs against trustworthiness, a formal hearing is not necessary when other indicia of trustworthiness are present. *Chavez v. Carranza*, 559 F.3d 486, 498 (6th Cir. 2009).

Because the defendants have not provided any convincing arguments regarding the report's lack of trustworthiness, the Court continues with the task at hand: that is, "determin[ing] whether and why certain portions of the Report are admissible or inadmissible." [Record No. 26, p. 20]

The DOJ Report alleges the following:

A riot occurred on August 21, 2017, when ten maximum-security prisoners forced their way out of their cell and into the hallway and ignited flammable items they had stacked against the entry doors.

A prisoner died of a drug overdose in June 2018.

A second prisoner died of a drug overdose in November 2018.

On December 21, 2018, five correctional officers were indicted for first-degree manslaughter of a prisoner found dead in a restraint chair on November 29, 2018, from blunt force trauma to his side which fractured three ribs and caused internal bleeding, resulting in death.

From March 2016 to November 2016, there were 60 incidents involving the use of pepper spray and 15 incidents involving the use of a taser.

In the "use of force" section of one incident report, the officer wrote "none," even though the narrative section of the report indicated that an officer fired "four rounds of OC pepper ball."

DOJ "reviewed one incident in which the former Jailer failed to follow his own policy and engaged in use of excessive force" by using "pepper spray as an immediate response to a woman who was kicking her cell door and refused to hand over her shoes."

A female pretrial detainee who refused a male Captain's order to leave a shower was pepper sprayed and then removed from the shower by four correctional officers. After the officers placed her face down on the floor, they tased her four times. When she attempted to return to the shower to wash off the burst of pepper spray, they pulled her from the shower and placed her on her back. "As she lay on her back, one correctional officer grabbed her right leg, another grabbed her left leg, and a third deployed pepper spray into her vagina."

A prisoner in a restraint chair, who was calm enough to be released to use the restroom, verbally refused to resubmit to the restraints. He was immediately tased twice, even though he was not posing a threat to himself or others. Officers did not attempt any other means to control the prisoner.

A male prisoner was tased by an officer upon intake simply because the prisoner said that he could not remove his wedding band, which he had been wearing for 20 years. After being tased, he still was unable to remove his wedding band.

A correctional officer placed a prisoner in a restraint chair because the prisoner complained about being denied a phone call to his family after a family member died.

A correctional officer responded to a complaint of two prisoners fighting. By the time the officer responded, the prisoners had stopped fighting, but the officer handcuffed both of them and placed them in restraint chairs.

BCDC staff is not trained on the continuum of force policy. Specifically, the jail did "not train, prepare, or even expect staff to interact with prisoners through non-forceful or non-combative modalities, such as effective verbal communication and positive interpersonal relationship building." Staff do not adequately and promptly report the use of force; reports rarely contain a videotape of the incident despite the jail having surveillance videos.

The vast majority of use-of-force incidents are not reviewed by a supervisor.

In 2015, the Jailer placed the facility's two restraint chairs in the hallway and ordered two female prisoners wearing suicide smocks to be strapped to the chairs. The straps secured the women's waists and chests to the chair, their arms behind their backs, and their legs to the opposite sides of their chairs. The combination of the leg and waist straps prevented the women from being able to move their knees together to shield their genitals from exposure. The Jailer then instructed correctional officers to transport male prisoners from their housing unit past the women.

In another incident in 2015, the Jailer ordered a woman who had a panic attack to be restrained in the restraint chair with her legs spread, clothed in nothing but a suicide smock, and placed on public display in the hallway.

[W]e have reasonable cause to believe that Boyd County routinely subjects prisoners to excessive force through the use of chemical agents, electronic control devices, and restraint chairs.

[W]e also conclude that Jail officials are deliberately indifferent to a pattern or practice of improper use of force by Jail staff.

Either the Jail has intentionally ignored the multiple instances we found of excessive force contained in its own incident reports, or has failed adequately to review, monitor, track, supervise, and/or investigate the documented excessive use of chemical agents and electronic control devices per its own policy.

In addition to using electronic devices and pepper spray, Jail officials use the restrain chair as the first means of dealing with a prisoner when less intrusive means are available.

The Jail fails to protect prisoners from harm due to use of excessive force through the use of chemical agents and electronic devices, and through the placement of prisoners into the restraint chair.

The Jail fails to protect prisoners from harm due to excessive force.

Having cleared the hearsay hurdle the Court finds that the Report, in its entirety, is admissible for purposes of summary judgment. "Objections for relevance are generally unnecessary on summary judgment because they are 'duplicative of the summary judgment standard itself.'" *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (quoting *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)). In ruling on a motion for summary judgment, the Court determines whether the evidence, when viewed in the light most favorable to the nonmoving party, creates a genuine issue of material fact. *Id.* (citing Fed. R. Civ. P. 56(a)). Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if it "has any tendency to make a fact more or less probable" and the fact "is of consequence in determining the action." *Id.* (citing Fed. R. Evid. 401). Combining these standards, "if evidence submitted on summary judgment could create a genuine dispute of material fact, it is, by definition, 'of consequence in determining the action,' and therefore relevant." *Id.*; *see also Ashdown v. Buchanan*, 2019 WL 3718315, *5 n.7 (S.D. Ohio Aug. 7, 2019) ("The standard for determining relevancy for evidence regarding a motion for summary judgment is 'extremely liberal.'") (citation omitted).

Accordingly, it is unnecessary for the Court to determine separately which individual portions of the report are admissible when considering the motion for summary judgment. However, the Court is mindful that, even under the generous standard of review applicable to motions for summary judgment, the Court does not accept legal conclusions or unwarranted factual inferences as true. *City of Monroe Emps. Retirement Sys. v. Bridgestone Corp.,* 399 F.3d 651, 665 (6th Cir. 2005).

Turning to the merits of the plaintiff's § 1983 claim, Simpkins did very little in response to the defendants' motion for summary judgment to explain *how* the DOJ Report demonstrates

the existence of a custom for purposes of *Monell*. [*See* Record No. 18.] Instead, he simply deferred to the DOJ's observations and conclusions. *See Threet v. Corr. Health Care Mgmt. of Okl., Inc.*, 2009 WL 10702855, at *4 (W.D. Okl. Oct. 26, 2009) (observing that the plaintiff in a § 1983 case essentially said, "look at the DOJ report," which he "lobbed into the room" like an "evidentiary hand grenade"). Despite this approach, the Court has examined the Report and formed its own analysis. In doing so, two main questions are presented: how many prior incidents does it take to constitute a "custom" and how similar must those incidents be to the conduct the plaintiff alleges.

The Sixth Circuit has not announced any bright-line rules to guide these fact-intensive inquiries and it acknowledged as much in this case. However, the court stated that it

> need not do so here, because it is at least clear that the incidents are similar enough to constitute a 'policy' within the meaning of *Monell*, as all of the incidents described above constitute, in the Report's words, 'the use of a restraint chair as corporal punishment without any penological justification,' … which is the precise mistreatment Simpkins alleges he suffered.

*Id.* at 457. The appellate court also concluded that the Report "supports a finding that BDCD was on notice of constitutional-rights violations and that officers were not adequately trained at the time of Simpkins' incident." *Id.* The court of appeals acknowledged that Simpkins had done little to "connect his own experience to the alleged customs and policies described in the Report." After all, Simpkins did not depose any BCDC staff. But the Sixth Circuit found that the DOJ report "arguably threads that needle for him, as well as provides evidence significantly probative of the other *Monell* elements." *Id.*

Simpkins also alleges a failure-to-train claim. To prevail on this theory, a plaintiff must establish: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy

was closely related to or actually caused the injury." *City of Canton v. Harris*, 489 U.S. 378, 389-90 (1989); *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). It is not sufficient to show that the particular officer was insufficiently trained—instead, the plaintiff must show that the municipality had an inadequate training program. *Stewart v. City of Memphis, Tenn.*, 788 F. App'x 341, 346 (6th Cir. 2019).

> The DOJ Report states:
>
> The pattern or practice of excessive force at the Jail is attributable, in part, to its inadequate training on its policies. . . . Jail staff are not trained on the continuum of force policy. The Jail does not train, prepare, or even expect staff to interact with prisoners through non-forceful or non-combative modalities, such as effective verbal communication and positive inter-personal relationship building. The Jail does not train its staff on how to de-escalate potentially hostile situations or provide any alternatives to using pepper spray and electronic control devices as a first response to prisoner conflict. Staff are given no training to help them manage prisoners in the Jail's overcrowded living conditions.

[Record No. 18-6, p. 12] The Sixth Circuit concluded that "the Report provides adequate evidence that deficient training caused Simpkins' injury." *Simpkins*, 48 F.4th at 458. Simpkins presumably would call a DOJ representative to testify regarding these matters at trial, as indicated in his Rule 26(a) disclosures, although such testimony would be limited by the requirements of Rule 803(8).

To establish that the inadequacy was the result of the municipality's deliberate indifference, a plaintiff must show "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Bonner-Turner v. City of Escorse*, 627 F. App'x 400, 414 (6th Cir. 2015) (quoting *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). Alternatively, a plaintiff may show a single violation of federal

rights, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such violation." *Id.* The Sixth Circuit's analysis in this case indicates that there are a sufficient number of prior instances of similar unconstitutional conduct from which a jury could reasonably conclude that the county was deliberately indifferent to the conditions that resulted in the plaintiff's alleged injury. Accordingly, the Fiscal Court is not entitled to summary judgment with respect to Simpkins' § 1983 claims.

## IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. The defendants' motion for summary judgment [Record No. 13] is **DENIED**.

2. The claims against Defendants Carl Tolliver, John Greer, Thomas Jackson, Stephen Towler, Bill Hensley, and Unknown Defendants, in their official capacities, are **DISMISSED**. Defendant Boyd County Fiscal Court is the only remaining defendant.

3. This matter is scheduled for a status conference on **Wednesday, November 9, 2022**, beginning at the hour of **11:00 a.m.** at the United States Courthouse in **LEXINGTON, Kentucky**.

Dated: October 11, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky